UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                        :

ELIYAMMA JOSE,                      :

                     :       Case No. 2:19-cv-04583-GRB-ST

           Plaintiff,    :

                   :       **AMENDED COMPLAINT**

       - against -       :

                   :

CHINNAMMA JOSHUA, JACOB JOSHUA,  :
PHILIP JOSHUA, ASHA JOSHUA, FINNEY  :
JOSHUA, BEENA JOSHUA, BINNY KOSHY, and  :
BETSY KOSHY,                :

                   :

         Defendants.    :

                   :

-------------------------------------------------------------------x

Plaintiff Eliyamma Jose, by and through her counsel, Greenberg Traurig, LLP and The Legal Aid Society, for her complaint against Defendants Chinnamma Joshua ("Chinnamma"), Jacob Joshua ("Jacob"), Philip Joshua ("Philip"), Asha Joshua ("Asha"), Finney Joshua ("Finney"), Beena Joshua ("Beena"), Binny Koshy ("Binny"), and Betsy Koshy ("Betsy") (collectively, "Defendants"), alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff Eliyamma Jose ("Plaintiff" or "Ms. Jose") brings this action for the damages that Defendants caused after forcing her into involuntary servitude for more than nine years after luring her from India to the United States ostensibly to be employed as a live-in domestic worker caring for two young children.  While in the United States, Defendants withheld Ms. Jose's passport and engaged in a campaign of fear and intimidation accomplished through physical and psychological coercion, and threats of deportation.  She was forced to work excessive hours and paid—when she was paid at all—far less than the lawful minimum wage.

2.      For over nine years, from on or about May 24, 2009 until on or about August 9, 2018, Defendants employed Ms. Jose as a live-in domestic servant. They forced her to work extremely long hours in their homes, seven days a week, with no days off or sick leave, and with few breaks.  Defendants restricted Ms. Jose's contact with the outside world, leaving her isolated and secluded from neighbors and law enforcement.  Defendants repeatedly threatened Ms. Jose that if she revealed the truth to anyone about her pay or working hours, she would be detained by governmental authorities and sent back to India.  Ms. Jose, who spoke no English when she arrived in the United States and was unfamiliar with this country's laws, believed what she was told.

3.      In August of 2018, Ms. Jose escaped from Defendants' dominion and control with the help of the Federal Bureau of Investigation ("FBI").  For the first time since arriving in the United States, Ms. Jose was in a position to assert her rights.

4.      Ms. Jose now brings this action pursuant to the Thirteenth Amendment of the United States Constitution, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPA"), the New York Labor Law ("NYLL"), and common law, seeking compensatory and punitive damages, restitution, attorneys' fees and costs.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because substantially all of the events giving rise to this action occurred within this District.

## PARTIES

7.      Ms. Jose is a 57-year-old citizen of India.  Malayalam is her native language and she has limited proficiency in English.  Ms. Jose currently resides in New York County, New York.

8.      Upon information and belief, Chinnamma and Jacob are married and maintain a residence in Roslyn Heights, New York.  Ms. Jose worked for them from on or about May 24, 2009 to on or about August 9, 2018.

9.      Upon information and belief, Philip is the son of Chinnamma and Jacob.  He is married to Asha.  They have three children and reside with Chinnamma and Jacob in Roslyn Heights, New York.  Ms. Jose worked for Philip and Asha from on or about May 24, 2009 to on or about August 9, 2018.

10.     Upon information and belief, Betsy is the daughter of Chinnamma and Jacob.  She is married to Binny.  They have three children and reside in Albertson, New York.  Ms. Jose worked for Betsy and Binny from on or about November 1, 2010 to on or about August 9, 2018.

11.     Upon information and belief, Finney is the son of Chinnamma and Jacob.  He is married to Beena.  They have two children and reside in Roslyn, New York.  Ms. Jose worked for Finney and Beena from on or about May 24, 2009 to on or about November 1, 2010 and from February 2015 to on or about April 2016.

## STATEMENT OF FACTS

### Recruitment and Trafficking to the United States

12.     In 2006, Ms. Jose worked as a nanny in the United Kingdom.  While there, Chinnamma's cousin, who was residing in the United States, visited her employer's home in the United Kingdom.  During the visit, the cousin told Ms. Jose that Chinnamma was looking for

someone to take care of her two grandchildren in the United States.  He told Ms. Jose that Chinnamma would pay her a monthly salary of $500, and he took down her phone number.

13.     Later in 2006, Ms. Jose returned to India and began receiving phone calls from Chinnamma.  On these calls, Chinnamma repeated what her cousin had told her:  that she would pay Ms. Jose $500 a month to take care of her two grandchildren in the United States.  Chinnamma added that if Ms. Jose stayed with her for four years without returning to India, Chinnamma would procure a Green Card for her.  Chinnamma also promised to bring Ms. Jose's youngest daughter to New York.

14.     Chinnamma called Ms. Jose throughout 2007 and 2008.  In 2008, Ms. Jose received a handwritten letter from Chinnamma which stated the proposed terms of Ms. Jose's employment: Ms. Jose would be paid $500 per month for taking care of two young children.  The letter stated that Ms. Jose would need to start her work at 7:30 a.m. but would be allowed to rest during the day. Ms. Jose agreed to those terms and decided to go to New York to work for Chinnamma. Based on Chinnamma's representations, Ms. Jose reasonably believed that she would work regular hours as a domestic worker, caring for two children, in a suitable working environment for $500 per month.

15.     Upon information and belief, Chinnamma and Jacob arranged for Ms. Jose to obtain a B-2 visa from the United States consulate in India for the purposes of obtaining Ms. Jose's labor and services.  Upon information and belief, Chinnamma and Jacob paid for Ms. Jose's B-2 visa. Prior to Ms. Jose leaving India to work for Chinnamma in the United States, Ms. Jose met with Chinnamma's relative, who took Ms. Jose's passport and consular documents.  This was a different relative from the one Ms. Jose met in the United Kingdom.

16.     On May 23, 2009, Ms. Jose traveled with Chinnamma's relative from India to New York with a plane ticket that Chinnamma had purchased for her.  At the airport, before passing through security, Chinnamma's relative told Ms. Jose not to speak to any security personnel; he would respond to any questions that were posed to her.  When they proceeded through customs, Chinnamma's relative presented Ms. Jose's passport to the border control officers and they boarded their flight.  He did not return the documents to Ms. Jose.

**Forced Labor, Exploitation, and Abuse in Chinnamma and Jacob's Home**

17.     On or about May 24, 2009, Ms. Jose landed at JFK airport, where Chinnamma, Philip, and one of Philip's children were waiting to pick her up.  Chinnamma's relative handed Ms. Jose's passport and consular documents to Chinnamma.  Chinnamma drove Ms. Jose to her home in Roslyn, New York.  The household consisted of Chinnamma, Jacob, their son and daughter-in-law, Philip and Asha, and Philip and Asha's three young children.

18.     The next day, Chinnamma informed Ms. Jose that she would be paid only 20,000 rupees each month (the equivalent of approximately $419), which would be sent directly to her daughters in India.  Ms. Jose was utterly shocked as they had agreed to a monthly salary of $500.  Chinnamma promised to increase her salary depending on the quality of her work.

19.     For approximately the next seventeen months, Ms. Jose worked exclusively in Chinnamma and Jacob's home.  Instead of only caring for the young children as promised, Ms. Jose was responsible for all domestic work for the entire household, which included Chinnamma, Jacob, Philip, Asha, and the three children.

20.     During those seventeen months, Ms. Jose's day began early in the morning, typically around 5:30 a.m., seven days per week.  Ms. Jose was not given any time to pray or eat breakfast before beginning her work.  She was required to dress the children and prepare and serve

5

breakfast for the entire family.  Each of the seven members of the household required their own dishes.  Some members of the family requested eggs or pancakes, or other American cuisine. Others requested Indian cuisine, which Ms. Jose was ordered to cook in a second kitchen located in the garage to keep the strong odors out of the house.  Asha was typically the first person to leave the house in the morning, and Asha would become angry at Ms. Jose if her breakfast was not prepared by the time she was ready to leave.

21.     Ms. Jose had to hurry back and forth between the two kitchens to tend to all of the dishes.  The garage did not have heating and, during the winter months, the garage became extremely cold.  Ms. Jose had to wear gloves and a coat while she cooked.  In the summer, the garage was stiflingly hot, and Ms. Jose would sometimes pour cold water on her head while she cooked at the stove.

22.     Ms. Jose was not permitted to sit and eat with the family at the kitchen table. Instead, while the family was eating, she had to begin lunch and dinner preparations. While standing at the counter or in front of the sink, Ms. Jose would try to grab a bite to eat.

23.     While she was living in Chinnamma and Jacob's home, Ms. Jose also had to prepare dinners for Finney, Beena, and their children in addition to the meals she prepared for Chinnamma, Jacob, Phillip, Asha, and the three children.  These meals would be sent to Finney and Beena's home each day.

24.     After the family ate breakfast and the children left for school, Ms. Jose had to wash the pots, pans, and dishes.  For the rest of the morning and afternoon, Ms. Jose had numerous household duties, including but not limited to, laundering and folding the clothes, vacuuming the floors, cleaning the bathrooms, and serving freshly cooked lunches to Chinnamma, Jacob, Philip, and/or any household member who was at the home, and cleaning the kitchen afterwards.  Ms.

Jose was allowed to eat lunch only once she finished her chores, which was typically around 4 p.m. Often, when Ms. Jose finally had the chance to eat, Chinnamma would remove food from her plate, reprimanding her that she was eating too much. If a guest was in the house, Ms. Jose would have to eat her meals in the garage.

25.     Ms. Jose was not allowed to take breaks during the day. If Chinnamma ever found Ms. Jose resting, Chinnamma would become angry and scold her. Chinnamma frequently told Ms. Jose to "shut up" and to not ask questions or words to the effect of "you should always be working and not sit still" and "nobody died from working too hard."

26.     At around 5:00 p.m. each day, Ms. Jose began preparing dinner for the family. As with breakfast, each family member demanded his or her own dishes and they ate in shifts throughout the evening. Ms. Jose served dinner, cleaned up, and washed the dishes. Between dinner shifts, Ms. Jose fed, bathed, dressed, and took care of the children. After the last member of the household ate dinner, Ms. Jose finished washing the dishes and cleaned the floors. Chinnamma did not allow Ms. Jose to use a mop; she forced Ms. Jose to get down on her hands and knees to scrub.

27.     By the time Ms. Jose tidied up the house and prepared for the next day's breakfast, it would be around 11:00 p.m. and most of the family would have already gone to sleep. Only then would Ms. Jose have time to pray and wash up. Chinnamma admonished Ms. Jose for showering each night. Chinnamma complained to Ms. Jose that she had to pay for the water and soap that Ms. Jose used and that people in India do not shower every night so neither should she.

28.     At Chinnamma's house, Ms. Jose was forced to sleep in the two youngest children's room. The two children had severe skin conditions and would often wake up crying during the night. Ms. Jose was regularly kept awake caring for the children throughout the night.

29.     As a result of these brutal work conditions, Ms. Jose was physically, mentally, and emotionally exhausted.

30.     In the summer months, Chinnamma would require Ms. Jose to work in the yard, which included but was not limited to pulling weeds, mixing fertilizer, cutting down branches, shoveling dirt, carrying logs, and planting shrubs.  Much of the work was physically taxing, and Ms. Jose's back and neck were frequently in pain.  Chinnamma also ordered Ms. Jose to dig up stones and dirt from the garden using a pickaxe and transport large stones and dirt in a basket from one part of the yard to another.

31.     In the winter months, Ms. Jose was required to shovel snow from the driveway on several occasions and was ordered to work in the garage, even though it had no heating.

32.     While the house was undergoing renovations in or around late 2009, Ms. Jose had to assist the builders by preparing and serving drinks and food, stacking the heavy construction materials scattered throughout the yard after the workers left for the day, and cleaning up after the workers.  One day, while Ms. Jose was clearing the front yard, a stray nail scraped her foot and she began to bleed.  When she showed Chinnamma her injury, Chinnamma merely sliced up an onion and placed a piece on the wound.  She told Chinnamma this would prevent infection.

33.     Mostly on Saturday evenings and Sunday mornings, Chinnamma allowed Ms. Jose to attend Church for about three hours, although Ms. Jose was not permitted to speak with anyone there.  Further, Ms. Jose had to prepare and cook breakfast and lunch beforehand and immediately work after she returned to the house.

**Forced Labor, Exploitation, and Abuse in Binny and Betsy's Home**

34.     On or about November 1, 2010, Ms. Jose was moved to the home of Chinnamma and Jacob's daughter and son-in-law, Betsy and Binny Koshy.  The Koshys were expecting a third

8

child and needed Ms. Jose to care for the newborn and older children and to perform household chores.  Ms. Jose was not given a choice on whether to move.  Before she left for the Koshy home, Chinnamma warned Ms. Jose not to ask the Koshys for any salary but that she would pay her.  For the next eight months, Chinnamma paid Ms. Jose only 2,000 rupees (the equivalent of approximately $40) per month.  After about eight months working in the Koshy home, Binny sent $4,000 ($500 per month) directly to Ms. Jose's daughters in India.

35.    Ms. Jose's typical day in the Koshys' home began at 6:30 a.m.  She prepared three meals for the family and took care of the three Koshy children.  She was required to care for the children and perform housekeeping duties, which included but was not limited to cleaning the house, laundering clothing, feeding and walking the dog, and picking up the youngest child from school.  Ms. Jose also had to care for the baby when she cried at night.  Typically, she did not go to sleep until 11:00 p.m. or 12:00 a.m.

36.    After about three months working exclusively in the Koshys' home, Ms. Jose was told she would have to work in Chinnamma's home on alternate days of the week, after preparing and serving breakfast for the Koshys.  At about 8:00 a.m. every other day of the week, Ms. Jose and the Koshys' baby were driven to Chinnamma's house where Ms. Jose would perform her usual chores and receive orders from Chinnamma while taking care of the baby.  Ms. Jose was driven back to the Koshys' home between 10 p.m. and 12 a.m. and worked in the Koshys' home the next day.  In about 2012 or 2013, after the Koshys complained to Chinnamma that they needed Ms. Jose to take care of their children in the evenings, Ms. Jose returned to their home at around 6:00 or 7:00 p.m.

37.     From about 2015 on, Ms. Jose worked almost exclusively in the Koshys' home although she still had to cook for Chinnamma and Jacob and work in Chinnamma's home from time to time.

38.     Ms. Jose was subjected to verbal abuse and physical intimidation by the Koshys. Betsy berated Ms. Jose if Ms. Jose's work was not to her satisfaction.  Betsy insulted Ms. Jose by saying that Ms. Jose had mental health problems and that she belonged in a "mental hospital." Once, Betsy scolded Ms. Jose for crying in front of her oldest son, who frequently hit Ms. Jose. Binny had to restrain Betsy after she nearly jammed her finger into Ms. Jose's eye.  Binny called Ms. Jose a servant and referred to himself as her master.

39.     Ms. Jose worked for Chinnamma, Jacob, Philip, Asha and the Koshys until around August 2018.  One summer afternoon in 2013, on a day Ms. Jose was working in the Koshys' home, approximately six law enforcement officers came to Chinnamma's house and, upon information and belief, asked to speak with Ms. Jose.  Upon information and belief, when the officers entered Chinnamma's house, Chinnamma excused herself, ran into one of the bathrooms in her house, shut the door, and called Ms. Jose on the telephone.  In a harried and whispered voice, Chinnamma told Ms. Jose that officers wanted to speak with her.  Chinnamma instructed Ms. Jose to lie about her salary, working hours, and the nature of her work, if asked.  Chinnamma told Ms. Jose that if she spoke the truth, she would be sent back to India.   Chinnamma then brought the officers to the Koshys' home, where they spoke briefly with Chinnamma and then departed without speaking to Ms. Jose.

40.     From then on, Defendants constantly instructed Ms. Jose to lie to law enforcement about her salary, working hours, and the nature of her work, if asked, and warned her that if she told the truth, she would be kicked out of the country.

41.     Following the officers' visit to Chinnamma's home, Defendants promised Ms. Jose $1,500 in "back pay" for the previous four years of work.  However, Chinnamma refused to give this money to Ms. Jose.  Instead, upon information and belief, Defendants gave the money to an immigration attorney they had retained on behalf of Ms. Jose for her Green Card application.

### Forced Labor, Exploitation, and Abuse in Finney and Beena's Home

42.     From about February 2015 to about March 2016, when the Koshys' home was undergoing renovations, the Koshys and Ms. Jose moved to the home of Finney and Beena Joshua. While she was there, Ms. Jose was responsible for childcare and housekeeping duties, including cooking, cleaning, and laundering the clothes for Finny, Beena, their two children, and Binny, Asha, and their three children.  Ms. Jose also had childcare duties.

43.     In or around 2015, FBI agents came to Finney and Beena's home and asked to speak with Ms. Jose.  The agents said they had received complaints regarding Ms. Jose's employment with the Joshua family.  The agents brought Ms. Jose to their car to speak with her.  Recalling Defendants' incessant warnings to her that if she spoke the truth she would be sent back to India, Ms. Jose feared telling the truth to the agents about her salary, working hours, and childcare duties.  When the agents asked Ms. Jose whether she had her passport, Ms. Jose replied that it had been taken from her.  The agents escorted Ms. Jose back to the house and instructed the family to return Ms. Jose's passport.  Ms. Jose received her passport that evening.  However, the passport had already been expired for two years.

### Psychological Abuse, Physical Abuse, Isolation, and Threats

44.     Defendants forced Ms. Jose to work unreasonable hours for them for over nine years at far below minimum wage through a practice and pattern of psychological and physical

coercion and abuse and threats of deportation.  Ms. Jose had only a limited education in India, spoke no English, and did not know her rights under American law.

45.     Defendants maintained control over Ms. Jose by confiscating her passport, isolating her, and restricting her communications and movements.  Ms. Jose could not use the telephone without Defendants' permission at Chinnamma's and Jacob's home, where she was allowed one short conversation with her children each week with Chinnamma listening in on another phone. At Chinnamma's direction, Ms. Jose had left her cell phone in India before she left for New York.

46.     Chinnamma opened and read all mail Ms. Jose received from India.  Ms. Jose was not allowed to leave the house of her own volition.  Ms. Jose was completely dependent on Defendants for transportation.  Because Chinnamma had confiscated her passport, Ms. Jose could not return to India.  In her over nine years working for Defendants, Ms. Jose never left Long Island. Ms. Jose asked Defendants to take her to see New York City, but Defendants refused.

47.     Defendants forced Ms. Jose to work for over nine years without a single day off. While she is a devout Christian, Ms. Jose was forced to work on Sundays, Christmas, New Years, and on all other holidays. These days were like any other workday for Ms. Jose, except that she was allowed to attend church for a few hours.

48.     The only contact Ms. Jose had with the outside world was church.  But when she went to church, Ms. Jose was forced to sit in between Chinnamma and other family members in the back of the church so that she would not talk to anyone.  At the conclusion of the church service, Chinnamma would monitor Ms. Jose, never letting Ms. Jose out of her sight, although after a few years Ms. Jose started surreptitiously talking to church members.  If a congregant approached Ms. Jose and began speaking to her, Chinnamma would immediately interject and drag Ms. Jose out of the church.

49.     Chinnamma told her that all of the congregants were liars and that if she spoke to them, she would be sent back to India.  Chinnamma instructed her not to tell anyone about her home life.  Chinnamma told Ms. Jose, "You cannot live in this country by telling the truth" or words to that effect.  Chinnamma intentionally caused Ms. Jose to fear that American authorities would arrest and deport her.  Ms. Jose believed Chinnamma because she knew nothing about the United States and its laws.

50.     In addition to isolating her, Defendants intentionally humiliated Ms. Jose and forced her to perform demeaning and physically painful tasks.  In Ms. Jose's first winter in New York, Chinnamma ordered Ms. Jose to wash lawn furniture outside in the freezing cold.  Ms. Jose, who only had a light coat and a pair of gloves, scrubbed the furniture outside for several hours.  Chinnamma suggested that Ms. Jose fill a bucket of hot water so that she could dip her hands in to warm up.

51.     On several occasions, Chinnamma defecated in either her bed or on the floor.  Chinnamma would order Ms. Jose to clean it up and then bathe her.

52.     Defendants generally denied Ms. Jose routine medical care.   In addition, Chinnamma forced Ms. Jose to work when she had fever and refused to buy medicine for her.

53.     In or around May 2015, while Ms. Jose was working in Chinnamma's yard, Chinnamma ordered her to retrieve a large bucket filled with stones and dirt from a pit that the landscapers had dug.  Ms. Jose protested that the bucket was too heavy to lift.  Chinnamma told Ms. Jose to remove a couple of stones and then try.  After removing the stones, Ms. Jose attempted to lift the bucket whereupon she felt a crack in her neck and then excruciating pain.  But Chinnamma did not take her to the emergency room.  Over the next month, Ms. Jose was denied medical care.  She was given over-the-counter medication for her neck pain, which spread to her

back, arms, and hands.  When the pain persisted, Chinnamma provided other pain medication, but this did not help.  Over time, the pain became unbearable and Ms. Jose was unable to walk, lie down, or sleep.  She would cry throughout the night because of the pain.  Ms. Jose's arm pain became so debilitating that she needed Chinnamma's assistance to remove her coat.  One Sunday at church, while Chinnamma was removing Ms. Jose's coat, she intentionally yanked at one of the sleeves, causing pain to radiate through Ms. Jose's arm.  Ms. Jose began to cry.  Chinnamma became angry and told Ms. Jose that she was in pain because she ate too much.

54.     After a few months, Phillip and Asha took Ms. Jose to see Asha's brother, who is a physical therapist.  He referred Ms. Jose for an x-ray and then prescribed an intense regimen of physical therapy.  He instructed Ms. Jose to refrain from physical labor for the next three months.  Defendants ignored these instructions and forced Ms. Jose to perform her regular chores.  Ms. Jose depended on Defendants to drive her to follow-up appointments with the physical therapist, but on several occasions, Defendants refused to take her.

55.     Defendants deprived Ms. Jose of basic necessities.  Because Defendants sent Ms. Jose's wages directly to India and the only money Ms. Jose occasionally received was on holidays totaling approximately $50 per year, Ms. Jose had no cash to spend on clothing.  Defendants gave Ms. Jose their old, worn-out clothing, which Ms. Jose had no choice but to wear.  Defendants referred to the clothing as "garbage" in front of Ms. Jose.  At Chinnamma's direction, Ms. Jose would rummage bags of discarded clothing and shoes that Defendants' neighbors left on the curb to try to find items that she could wear or send to her daughters in India.  However, Chinnamma would often take Ms. Jose's findings for herself or for her family and would tell Ms. Jose that children in India should not wear such expensive clothing.

14

### Defendants' Wage and Notice Violations

56.    Ms. Jose's monthly salary fluctuated throughout the nine years she worked for Defendants.  Ms. Jose worked 15 to 20-hour days and was paid intermittently, not on any regular basis.  Her wages were transferred directly to India either via Western Union or friends of Defendants who were traveling to India so she had no access to any money while working for Defendants.

57.    From May 24, 2009 to about October 31, 2010 Ms. Jose earned a monthly salary of approximately $419 from Chinnamma and Jacob.

58.    From about November 2010 to July 2011, her first eight months at the Koshy's home, Chinnamma paid Ms. Jose approximately $40 each month.  After about eight months at the Koshy's, Binny sent approximately $4,000 to Ms. Jose's children in India.  From then on, the Koshys paid Ms. Jose $500 per month through December 2017.

59.    From about August 2011 to May 2012, Philip and Asha paid Ms. Jose $100 each month.  In about June 2012, Philip and Asha raised this to $200.

60.    Ms. Jose has not been compensated at all for her work from January 1, 2018 to August 9, 2018.

61.    Early on in her employment with Defendants, Ms. Jose confronted Chinnamma with the letter she had sent to her in 2008, which stated that Ms. Jose would be paid $500 each month, not the $419 she was receiving.  Chinnamma ripped the letter from Ms. Jose's hands and told her she would never see the letter again.  Ms. Jose never did.

62.    On two occasions, Ms. Jose borrowed money from Chinnamma to pay her daughter's tuition.  Ms. Jose was forced to work for Chinnamma to repay these loans.

15

63.     Defendants had no notice of her employment rights and, as a foreigner working in the United States with limited English ability, was unaware of the NYLL and any of their minimum wage or overtime provisions.  Defendants' conduct prevented Ms. Jose from asserting her rights.  Their psychological coercion, isolation, and threats prevented her from escaping or seeking help, until August 2018, when she was able to get away from Defendants.

### Liberation

64.     Following the FBI's visit to Finney and Beena's home in 2015, Defendants became extremely hostile toward Ms. Jose.  When Ms. Jose asked them about the status of her Green Card application, Defendants would become angry and brush her off.  Ms. Jose never spoke with the immigration attorney Defendants had retained for her.  When the attorney called Defendants, they refused to allow Ms. Jose to speak with him.  On numerous occasions, Ms. Jose overheard Defendants discussing sending her back to India, which distressed her greatly.  Eventually, Chinnamma admitted to Ms. Jose that the family was not helping her with her Green Card application, and actually wanted to send her back to India.  Even though Ms. Jose had worked for them for years and did everything they had ever asked from her, Defendants repeatedly told Ms. Jose they wanted her to leave.  However, Ms. Jose spoke no English, her passport had expired, and she did not know anyone who was looking to hire a domestic worker.

65.     In early 2018, Binny set a three-month deadline for Ms. Jose to leave his house.  Ms. Jose reminded Binny that her passport had expired and that she had nowhere to go.  When the three months had passed and Ms. Jose still had not left, Binny warned Ms. Jose that if she did not leave the house in three weeks, he would get somebody to make her leave.  Ms. Jose was now worried about her safety.

66. On August 9, 2018, federal agents came to the Koshys' residence while Binny and Betsy were out. Ms. Jose, who was at home watching the children, did not open the door as she was forbidden from opening the door when Binny and Betsy were not there. The agents communicated with Ms. Jose through a Malayalam interpreter. They assured Ms. Jose that they had come to help her. Eventually one of the Koshy children opened the door. The agents entered the home and told Ms. Jose that she did not have to live with Defendants anymore. The officers then escorted Ms. Jose out of the home to safety.

## FIRST CLAIM FOR RELIEF

### Involuntary Servitude in Violation of the Thirteenth Amendment to the United States Constitution and 18 U.S.C. §§ 1584, 1595

#### (Against All Defendants)

67. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs as if fully set forth herein.

68. Plaintiff brings this claim for relief under both the Thirteenth Amendment to the United States Constitution and 18 U.S.C. § 1584, which prohibit involuntary servitude. There is an implied right to bring a private cause of action to address violations of the Thirteenth Amendment, and an express right to bring a civil cause of action for violations of 18 U.S.C.§ 1584 in 18 U.S.C. § 1595.

69. The Thirteen Amendment to the United States Constitution prohibits slavery and involuntary servitude in the United States and grants Congress the "power to enforce this article by appropriate legislation." U.S. Const. amend. XIII.

70. Under 18 U.S.C. § 1584, it is unlawful to "knowingly and willfully hold[] to involuntary servitude . . . or bring[] within the United States any person so held."

71.     "Involuntary servitude" includes "a condition of servitude induced by means of any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or . . . abuse or threatened abuse of the legal process."  22 U.S.C. § 7102(6).

72.     In violation of 18 U.S.C. § 1584, Defendants brought Ms. Jose to the United States for the purpose of involuntary servitude and knowingly and willfully subjected Ms. Jose to a condition of involuntary servitude for over nine years in the United States by leading her to believe she would suffer serious financial and/or legal harm if she did not continue to work for Defendants. Defendants further held Ms. Jose in a condition of involuntary servitude by confiscating her passport, severely limiting her access to money, placing her under constant surveillance, and confining her in their home.

73.     Defendants used fraudulent misrepresentations, threats, abuse, coercion and intimidation to hold Ms. Jose in their employment and forced her to work without paying her the compensation required by law.

74.     Defendants have violated the Thirteenth Amendment to the United States Constitution.

75.     Ms. Jose brings this claim for relief pursuant to the private right of action granted by 18 U.S.C. § 1595.

76.     As a direct and proximate result of Defendants' actions, Ms. Jose has suffered damages in an amount to be established at trial.

77.     Ms. Jose is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

### Forced Labor in Violation of 18 U.S.C. §§ 1589, 1595

### (Against All Defendants)

78. Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs as if fully set forth here.

79. Under 18 U.S.C. § 1589(a), it is unlawful to "knowingly provid[e] or obtain[] the labor or services of a person . . . (1) by means of force, threats of force, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."

80. As alleged here, Defendants knowingly provided and/or obtained Ms. Jose's services as a domestic worker by abuse of law or legal process and/or through a scheme to make Ms. Jose believe that she would suffer serious harm if she did not continue to provide services to Defendants.

81. Defendants knowingly provided or obtained Ms. Jose's services by means of physical restraint by confiscating her passport, monitoring her movements, and subjecting her to physical and verbal abuse.

82. Defendants knowingly threatened Ms. Jose with serious harm by telling her that, if she spoke to anyone about her wages, working hours, or chores, she would be deported.

83. Defendants knowingly implemented a scheme, plan or pattern intended to cause Ms. Jose to believe that, if she did not perform domestic services for them, she would suffer serious

harm by depriving her of her liberty by confiscating her passport, restricting and monitoring her communications with others, failing to pay her wages due, and through repeated physical and verbal abuse.

84.     Under 18 U.S.C. § 1589(b), it is unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in [Section 1589(a)], knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means."

85.     Defendants knowingly benefited, financially or by receiving value, from participation in a venture which they knew or should have known engaged in violations of 18 U.S.C. § 1589, namely Ms. Jose's services for meager compensation.

86.     Ms. Jose brings this claim for relief pursuant to 18 U.S.C. § 1595.

87.     As a direct and proximate result of Defendants' actions, Ms. Jose has suffered damages in an amount to be established at trial.

88.     Ms. Jose is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

### THIRD CLAIM FOR RELIEF

**Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. § 1590, 1595**

**(Against All Defendants)**

89.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs as if fully set forth here.

90.     Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit[], harbor[], transport[], provid[e], or obtain[] by any means, any person for [peonage, slavery, involuntary servitude, or forced labor]."

91.     Chinnamma knowingly recruited, transported, harbored, provided and/or obtained Ms. Jose, bringing her to the United States for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. §§ 1589 and 1592, and therefore violated 18 U.S.C. § 1590.

92.     Joshua, Philip, Asha, Finney, Binny, and Beena knowingly transported, harbored, provided and/or obtained Ms. Jose for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. § 1589 and 1592, and therefore violated 18 U.S.C. § 1590.

93.     Defendants knowingly violated the prohibitions against involuntary servitude, forced labor, and peonage set forth in 18 U.S.C. §§ 1584(a), 1589(a) and (b), and 1590(a).

94.     Ms. Jose brings this claim for relief pursuant to 18 U.S.C. § 1595.

95.     As a direct and proximate result of Defendants' actions, Ms. Jose has suffered damages in an amount to be determined at trial.

96.     Ms. Jose is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF

**Benefitting Financially from Trafficking in Persons in Violation of
18 U.S.C. §§ 1593A, 1595**

**(Against All Defendants)**

97.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

98.     18 U.S.C. § 1593A makes it unlawful to "knowingly benefit[], financially or by receiving anything of value, from participation in a venture which has engaged in any activity in

21

violation of section . . . 1595(a), knowing or in reckless disregard of the fact that the venture has engaged in such violation" to the same extent "as a completed violation of such section."

99.     Defendants knowingly benefitted financially or by received something of value, namely Ms. Jose's domestic services, from participation in a venture that engaged in activities in violation of 18 U.S.C. § 1595(a) and knowingly or recklessly disregarded the violation of this provision.

100.     Ms. Jose brings this claim for relief pursuant to 18 U.S.C. § 1595.

101.     As a direct and proximate result of the conduct of Defendants, Ms. Jose has suffered damages in an amount to be determined at trial.

102.     Ms. Jose is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF

**Unlawful Conduct with Respect to Documents in Furtherance of Trafficking, Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of 18 U.S.C. §§ 1592, 1595**

**(Against Chinnamma)**

103.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

104.     Pursuant to 18 U.S.C. § 1592(a), it is unlawful to "knowingly destroy[], conceal[], remove[], confiscat[e], or possess[] any actual or purported passport or other immigration document, or any other actual or purported government identification document, of another person . . . in the course of a violation of . . . [or] with intent to violate [the provisions under the Trafficking Victims Protection Reauthorization Acts prohibiting trafficking, peonage, slavery, involuntary servitude, or forced labor]; or . . . to prevent or restrict or to attempt to prevent or restrict, without

22

lawful authority, the person's liberty to move or travel, in order to maintain the labor or services of that person, when the person is or has been a victim of a severe form of trafficking in persons."

105.     Chinnamma knowingly concealed, removed, confiscated, and/or possessed Ms. Jose's passport in the course of a violation of and/or with the intent to violate 18 U.S.C. §§ 1589 and 1590.

106.     Chinnamma knowingly confiscated and possessed Ms. Jose's passport to prevent or restrict or to attempt to prevent or restrict, without lawful authority, Ms. Jose's liberty to move or to travel in order to maintain her labor or services.

107.     Ms. Jose brings this claim for relief pursuant to 18 U.S.C. § 1595.

108.     As a direct and proximate result of the conduct of Defendants, Ms. Jose has suffered damages in an amount to be determined at trial.

109.     Ms. Jose is entitled to recover compensatory and punitive damages in an amount to be determined at trial, as well as attorneys' fees and costs.

## SIXTH CLAIM FOR RELIEF

**New York State Minimum Wage Violations**
**N.Y. Lab. L. §§ 190 *et seq*. and 650 *et seq*.**

**(Against All Defendants)**

110.     Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

111.     The New York Labor Law requires employers to pay a minimum hourly wage for covered employees in New York State.  N.Y. Lab. L. § 652; 12 N.Y.C.R.R. § 142-2.1.

112.     At all times relevant to this action, Ms. Jose was an employee covered by state minimum wage law.  N.Y. Lab. L. § 2,651-652; 12 N.Y.C.R.R. § 142-2.1.

113.    At all times relevant to this action, Defendants employed Ms. Jose within the meaning of New York Labor Law § 2, 651.

114.    At all times relevant to this action, Defendants were employers within the meaning of New York Labor Law.  N.Y. Lab. L. § 2, 651.

115.    In all periods of Ms. Jose's employment, Defendants failed to pay Ms. Jose the proper minimum wage, as required by New York state law.  N.Y. Lab. L. § 650 *et seq.*

116.    Defendants' failure to pay Ms. Jose the minimum wage was willful and/or not in good faith.

117.    Ms. Jose is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper state minimum wage she should have been paid, liquidated damages, prejudgment interest, attorneys' fees, and costs.

### SEVENTH CLAIM FOR RELIEF

**New York State Overtime Violation**
**N.Y. Lab. L. §§ 190 *et seq*. and 650 *et seq*., 12 N.Y.C.R.R. § 142-2.2**

**(Against All Defendants)**

118.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

119.    Defendants failed to pay Ms. Jose overtime pay for her work in excess of forty-four (44) hours per week, as required for a residential employee in violation of New York Labor Law §§ 190 *et seq.* and 650 *et seq.* and New York Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

120.    Defendants' failure to pay Ms. Jose overtime pay was willful and/or not in good faith.

121.    Ms. Jose is entitled to an award of damages for overtime pay for each hour she worked over 44 hours per week in an amount equal to the proper overtime pay she should have been paid, liquidated damages, prejudgment interest, attorneys' fees, and costs.

## EIGHTH CLAIM FOR RELIEF

### New York Labor Law, Spread-of-Hours Pay
### N.Y. Lab. L. §§ 190 *et seq*. and 650 *et seq*., 12 N.Y.C.R.R. § 142-2.4

### (Against All Defendants)

122.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

123.    Defendants failed to pay Ms. Jose an extra hour's pay at the rate of the minimum wage for every day that she worked in which the interval between her start and end time exceeded ten hours, in violation of N.Y. Lab. L. §§ 190 et seq. and New York State Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.4.

124.    Defendants' failure to pay Ms. Jose spread-of-hours pay was willful and/or not in good faith.

125.    Ms. Jose is entitled to an award of an extra hour's pay for every day that she worked in excess of ten hours, liquidated damages, prejudgment interest, attorneys' fees, and costs.

## NINTH CLAIM FOR RELIEF

### New York Labor Law, Frequency of Payment Violation
### N.Y. Lab. L. § 191(1)(a)(i)

### (Against All Defendants)

126.    Plaintiff realleges and incorporates each and every allegation contained in the above paragraphs as if fully set forth here.

127.     New York Labor Law requires employers to pay manual laborers each week.  N.Y. Lab. L. § 191(1)(a)(i).

128.     Ms. Jose did not receive payment of wages within seven calendar days after the end of the week in which the wages were earned, in violation of N.Y. Lab. L. § 191(1)(a)(i).

129.     Defendants' failure to pay Ms. Jose the promised wages with lawful frequency was willful and/or not in good faith.

130.     Ms. Jose is entitled to any underpayment suffered, prejudgment interest, liquidated damages, and attorneys' fees and costs.

## TENTH CLAIM FOR RELIEF

### New York Labor Law, Wage Notice Violation
### N.Y. Lab. L. § 195

### (Against All Defendants)

131.     Plaintiff realleges and incorporates each and every allegation contained in the above paragraphs as if fully set forth here.

132.     Employers are required to "furnish each employee with a statement with every payment of wages listing . . . rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission or other; gross wages, deductions, allowances, if any" among other things. *Id.* at § 195(3).

133.     Defendants failed to provide Ms. Jose the notice of her rights upon hire and wage statements that complied with New York Labor Law.

134.     Defendants' failure to provide Ms. Jose notice of her rate of pay and legally adequate wage statements was willful and not in good faith.

135.    Ms. Jose is entitled to damages of two-hundred and fifty dollars for each week that she did not receive the notice required by N.Y. Lab. L. § 195(3)(a), attorneys' costs and fees, together not to exceed $5,000 and injunctive and declaratory relief.  *Id.* at § 198(1-d).

## ELEVENTH CLAIM FOR RELIEF

### New York State Failure to Pay Promised Wages
### N.Y. Lab. L. §§ 190 *et seq*.

### (Against All Defendants)

136.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

137.    The New York Labor Law requires employers to pay promised wages for every hour worked.  N.Y. Lab. L. §§ 190, 191, *et seq.*

138.    For the period of Ms. Jose's employment, Defendants failed to pay Ms. Jose the promised wage of $500 per month and the corresponding overtime rate for hours over forty hours per week.

139.    Defendants' failure to pay Ms. Jose the promised wages was willful and/or not in good faith.

140.    Ms. Jose is entitled to her promised wages, liquidated damages, prejudgment interest, attorneys' fees and costs.

## TWELFTH CLAIM FOR RELIEF

### Unjust Enrichment

### (Against All Defendants)

141.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth here.

142.    Ms. Jose provided cooking, cleaning, and childcare services to Defendants for over nine years in good faith and with the expectation that she would be fairly compensated for such services.

143.    Defendants accepted and benefitted from those services at Plaintiff's expense but failed to compensate Ms. Jose for the reasonable and/or fair market value of her services.

144.    Defendants have been unjustly enriched at Plaintiff's expense.

145.    Equity and good conscience require restitution to Plaintiff for the reasonable value of these services.

146.    Plaintiff is therefore entitled to recover damages in an amount to be proven at trial.

## THIRTEENTH CLAIM FOR RELIEF

### Quantum Meruit

### (Against All Defendants)

147.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

148.    Ms. Jose provided cooking, cleaning, and childcare services to Defendants for over nine years in good faith and with the expectation that she would be fairly compensated for such services.

149.    Defendants accepted and benefitted from those services at Plaintiff's expense but failed to compensate Ms. Jose for the reasonable and/or fair market value of her services.

150.    Plaintiff should be compensated in quantum meruit in an amount to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF

### Breach of Contract

### (Against Chinnamma and Jacob)

151.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

152.    In 2008, Defendants Chinnamma and Jacob Joshua sent a handwritten contract to Plaintiff in India.  The agreement stated that Plaintiff would take care of Defendants' two grandchildren and Defendants would pay Plaintiff $500 per month, among other promises.

153.    Plaintiff agreed to these terms.

154.    Plaintiff performed her obligations under this written contract.

155.    Chinnamma and Jacob Joshua egregiously, willfully, and wantonly breached the terms of the written contract.

156.    This written contract is no longer in Plaintiff's possession because Chinnamma took it from her and never returned it.

157.    Plaintiff is therefore entitled to recover damages, including punitive damages, in amount to be determined at trial.

## FIFTEENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

### (Against All Defendants)

158.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159.    Defendants acted in an extreme and outrageous manner, well beyond the bounds of normal human decency, by intentionally inflicting emotional injury on Ms. Jose by trafficking her

from India to the United States, confiscating her passport, monitoring her movements and phone conversations, reading her mail, limiting her contact with her daughters in India, refusing to pay her a decent wage, denying her medical attention, insulting her, threatening her, and requiring her to perform degrading tasks.  Defendants also acted in an extreme and outrageous manner on a continuous and systematic basis by threatening Plaintiff that she would be deported if she ever socialized with anyone.

160.   Defendants' extreme and outrageous conduct caused Ms. Jose severe emotional distress.  Defendants' conduct caused Ms. Jose to be afraid for her physical safety and to feel humiliated.

161.   Defendants committed these acts maliciously and oppressively, with the wrongful intention of causing harm to Ms. Jose, and in conscious disregard of Ms. Jose's rights.

162.   As a direct and proximate result of Defendants' intentional actions, Ms. Jose has suffered and continues to suffer severe mental distress, emotional injuries, humiliation, embarrassment, and economic loss.

163.   Ms. Jose is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorneys' fees, and the costs of this action.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that judgment be entered in her favor against Defendants as follows:

1. Declaring that Defendants violated the Thirteenth Amendment to the United States Constitution, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, the New York Labor Law, and the common law;

2. Awarding Plaintiff punitive and compensatory damages, including but not limited to, damages for pain and suffering, in an amount to be determined at trial, and such other relief as the Court deems just and proper pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595;

3. Awarding Plaintiff unpaid wages, including promised wages, minimum wages, overtime pay, and spread-of-hours pay, plus liquidated damages, interest, attorneys' fees and costs, pursuant to New York Labor Law § 190, *et seq*.;

4. Awarding Plaintiff statutory damages for Defendants' failure to provide Plaintiff with required wage notice statements pursuant to New York Labor Law § 195(3);

5. Awarding Plaintiff compensatory and punitive damages due to unjust enrichment, quantum *meruit*, breach of contract, and intentional infliction of emotional distress;

6. Awarding Plaintiff reasonable attorneys' fees, together with the costs and disbursements of this action;

7. Awarding Plaintiff pre-judgment and post-judgment interest as allowed by law;

8. Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  June 19, 2020
        New York, New York

                              Respectfully submitted,


                              THE LEGAL AID SOCIETY


                               */s/ Sumani Lanka*
                              _____
                              Sumani Lanka, *Of Counsel*
                              Janet Sabel, *Attorney-in-Chief*
                              Young Lee, *Of Counsel*
                              199 Water Street, 3rd Floor
                              New York, New York 10038
                              Telephone: (212) 577-3300
                              Fax: (646) 616-9468
                              svlanka@legal-aid.org

                              GREENBERG TRAURIG, LLP
                              Alan Mansfield
                              Daniel Friedman
                              Noah Lindenfeld
                              200 Park Avenue
                              New York, New York 10166
                              Telephone: (212) 801-9200
                              Fax: (212) 801-6400
                              mansfielda@gtlaw.com
                              friedmand@gtlaw.com
                              lindenfeldn@gtlaw.com

                              *Attorneys for Plaintiff Eliyamma Jose*